## FEDERAL SURETY CO. v. MILLSPAUGH & IRISH CORPORATION.

(Circuit Court of Appeals, Seventh Circuit. June 12, 1926. Rehearing Denied September 26, 1926.)

No. 3676.

1. **Appeal and error** ⬤⇒1056(1).

In action against surety company, where apparent authority of defendant's agent was undisputed, exclusion of evidence of limitations on his authority *held* not prejudicial.

2. **Principal and surety** ⬤⇒160.

In action against surety company on bond for performance of contract, evidence of statements and acts of defendant's agent, who had obtained the business and acted for it in endeavoring to arrange for performance of contract, *held* properly admitted.

3. **Principal and surety** ⬤⇒128(2).

Extensions or renewals of notes and other obligations under contract *held* not without consent of surety on bond for performance of contract, as affecting any right to release from liability.

4. **Frauds, statute of** ⬤⇒144.

Surety on bond for performance of contract *held* estopped to assert invalidity under

statute of renewals and extensions of the indebtedness guaranteed, by its agent's participation and consent thereto.

**5. Principal and surety ⊚⟞161—In action against surety on bond for performance of contract, evidence held not to show payment of defaulting company's notes, relieving defendant.**

In action against surety on bond for performance of contract, evidence that plaintiff company, with approval of defendant's· agent, had given its own checks to banks, which had discounted notes of defendant's defaulting principal, and taken new notes, which it again discounted, *held* not to show a payment of defaulting company's paper, which was clearly not intended.

**6. Principal and surety ⊚⟞163.**

In action against surety on bond for performance of contract to purchase taxicab bodies, where undelivered bodies ·and others partly manufactured were disposed of in a manner approved by surety company and to its benefit, it was not error to measure damages by purchase price less amount so realized.

In Error to the District Court of the United States for the District of Indiana.

Action by the Millspaugh & Irish Corporation against the Federal Surety Company. Judgment for plaintiff, and defendant brings error. Affirmed.

February 7, 1923, and March 31, 1923, respectively, defendant in error, an Indiana corporation (for convenience called Millspaugh Company) entered into contracts with the Barley Motor Car Company (for convenience called Barley Company) to build for the latter under each contract 250 taxicab bodies as described in the contracts therefor, at the price of $625 each under the first contract, and $425 under the second, deliveries and payments to be made as in the contracts specified, the bodies to be of a special design to fit a special taxi chassis. To secure to Millspaugh Company the performance of the contracts by Barley Company the latter gave to the former on each contract a bond in the penal sum of $50,000, signed as surety by plaintiff in error, an Iowa corporation, engaged in the business of writing such bonds, and doing buisness in Indiana. The same surety company also executed and delivered bonds indemnifying Barley Company against loss through any failure of Millspaugh Company to perform its part of the same contracts.

Millspaugh Company, at its factory in Indianapolis, proceeded to build the bodies in accordance with the specifications, and deliveries as specified were begun. Deliveries were interrupted for a time, but were resumed, and further accepted. Certain initial deposits as contracted for were made by the Barley Company and trade acceptances and notes given as deliveries were made, but soon default in payment was made. Further deliveries were suspended, a large number of the bodies being stored, ready for delivery. The agent of the surety company at Indianapolis was fully advised of the situation, and he recommended slowing up of further deliveries until payments might be made or otherwise arranged for. ·Trade acceptances and notes becoming due, arrangements· were made for extending them, generally through the form of Millspaugh Company giving its checks to the banks which held the obligations, thus taking up the matured Barley paper, and discounting new Barley obligations given in their stead. Negotiations pended for some time for the refinancing of Barley ,Company, whose concern was with the consent of all concerned transferred to another company, without affecting the obligations in question, but the negotiations ultimately fell through, and the concern failed, leaving a large number of delivered bodies unpaid for, a considerable number of completed bodies on hand, and many of the bodies in process of construction, with the materials on hand fabricated to be incorporated in the partly made-up bodies.

Millspaugh Company proceeded to dispose of the bodies, finding another taxicab concern which agreed to take them if they were remade to fit taxicabs of their design, whereupon the completed bodies were changed to comply with the new purchaser's taxicab specifications, and the partly made bodies were completed by the use of the materials on hand, so that they also would comply with the new design, and the materials on hand ·were used for such purposes. The amount realized from the transaction, less the cost of making the bodies comply with the purchaser's specifications, was credited upon purchase price which Millspaugh Company was to receive under the two contracts, and, after deducting all payments that had previously been made, ·the balance was claimed from the surety company under the bonds. The verdict and judgment were for $34,650. Further facts appear in the opinion.

Claris Adams, of St. Louis,. Mo., for plaintiff in error.

William H. Thompson, of Indianapolis, Ind., for defendant in error.

Before ALSCHULER, PAGE, and ANDERSON, Circuit Judges.

ALSCHULER, Circuit Judge (after stating the facts as above). [1] Most of the

propositions raised turn upon the extent of the authority of one Scoonover, the Indiana state agent of the surety company, who on its behalf secured the business, and at Indianapolis signed the bonds in the name of the surety Company, "by E. J. Scoonover, Attorney in Fact," and attached the company's seal. From this mode of signing it is contended for the surety company that all concerned were notified of Scoonover's limited agency, and that for the extent of his authority resort must be had to the instrument creating it. This instrument it was sought to introduce in evidence, but it was excluded. It provides in short that Scoonover should represent the company in Indiana in the placing of business, appointing the subagents, and the like, with power to execute and deliver bonds, but makes no provision for his settlement of claims or binding his principal in any other way, and specified that the agent shall not alter any contracts entered into. The obligee of the bonds knew nothing of such delegation or of any limitation of Scoonover's authority, but it appears that upon the printed stationery supplied by his company and used by him in his frequent correspondence with it, as well as with the public, including Millspaugh Company, Scoonover is described as "general agent for the state of Indiana," and there is nothing in all the record to indicate that as to the public Scoonover's authority was different or less than ordinarily inheres in a general agent or a state of such a concern. Through the exclusion from evidence of the power of attorney, plaintiff in error was not injuriously affected, since, whatever its limitation, Scoonover's apparent authority as general agent for the state was undisputed.

When the Barley Company began falling behind in payments, Scoonover was promptly notified, and practically all of the steps thereafter taken—extension of time for payment, withholding or slowing up of further deliveries, negotiations for refinancing looking to the paying up of these obligations—were with the full knowledge of Scoonover, and generally with his consent and advice. Not only this, but from time to time, by correspondence and otherwise, he kept the home office advised, and there were few, if any, of the substantial details of which it did not have knowledge, and in some instances direct participation.

The situation was one where to assume that no one was looking after the interests of the surety company would be to ascribe to it the most palpable disregard of its own interest. It had placed itself in the very delicate position of being on both sides, in that it undertook to guarantee to each party to the contracts performance by the other. This precarious situation was recognized by the home office, when it wrote Scoonover in December, after deliveries had stopped and payments were in arrear: "As you are aware, this is a peculiar case in so far as we are concerned, because it is out of the ordinary; we being surety on both sides of this contract."

Under date of following January, 1924, Scoonover wrote the home office that the estimated indebtedness to Millspaugh Company under the contracts was $40,000, much, if not all, of which had theretofore been from time to time renewed, and outlined the proposed plan for refinancing, and on February 4 wrote a formal letter to Millspaugh Company, signing it "Federal Surety Company, by Scoonover, General Agent in Indiana," saying "the surety company gave its consent to the financing proposition, and will not void any outstanding liability of said bonds up to this date."

[2, 3] In this state of the record there is no merit in those various contentions of error predicated upon the admission in evidence of the statements and acts of Scoonover; and the contention also falls that extensions or renewals of notes and other obligations under the contracts were without the consent of the surety company, and thus relieved it from liability on such obligations as were extended or renewed, if, indeed, such extension or renewal made in good faith, without consent of a compensated surety, would of itself relieve it from further obligation.

[4] The contention is made that the contracts of surety, being agreements to answer for the debt or default of another, must under the statute of frauds be in writing to be valid, and that renewals or extensions of the indebtedness guaranteed must be in writing to be valid against the surety. If such writing were required, the above-mentioned letter of February 4 might well be so considered. But here again the knowledge and active participation of the company by its home office correspondence as well as the acts of its general agent in Indiana indicate not only its consent, but its desire, that the obligations should be renewed, in the hope that in some way means might be found for ultimately relieving it from its $100,000 of potential liability. As early as August 27 Scoonover wrote: "If the Millspaugh & Irish Corporation would let some of this paper go to protest, then the fat is in the fire and we would all be in trouble." It is apparent that the extensions were quite as much for the benefit of the surety company as any one else concerned. The knowledge it

thus had of what was being done, together with its participation therein and consent thereto, estop it from raising any such question.

[5] It is insisted that through the form in which the extensions were effected, viz.: the Millspaugh Company giving to the banks which had discounted the Barley Company paper its own checks therefor, and taking new Barley Company notes, which the banks in turn discounted, the notes were paid and the surety company relieved. Millspaugh Company had discounted the paper and had to stand back of it. Protest was not desirable for any one concerned, and, above all, the evidence shows that Scoonover was fully informed of and approved this method of renewing or extending the obligations. It is clear that payment was not intended nor effected by such transactions.

[6] The measure of damages respecting the undelivered completed bodies, the partly made bodies, and the materials on hand is vigorously assailed as being contrary to the asserted rule of damages in such cases. Under the facts we need not deeply concern ourselves with ofttimes highly technical questions of measure of damages on breach of contract. The acts of the parties respecting the unusual circumstances appearing are sufficient for the adjudication of the damages. While the body was the completed article contracted for, it was not of itself a completed article of commerce. It was apparent that these bodies had no general market by reason of their inadaptability to any chassis, other than that for which they were specially designed, but which was no longer being made. A purchaser was found who would take them if they were altered to fit his chassis, and this could be done only by making substantial and expensive alterations, which were made, and but for which it is quite evident that the made-up bodies would have been practically a total loss. Substantially the same situation existed as to partly manufactured bodies, and also as to the materials on hand which were of special shapes and dimensions, machined for the particular bodies in whose manufacture they were to enter. All such would have had but little more than junk value, had they not been handled practically as they were; and it is apparent from the evidence that Millspaugh Company adopted the best means for minimizing the loss and of securing the best net result.

The evidence tends to show that Scoonover was kept posted with reference to the salvaging of the bodies and materials; indeed, it would be quite unreasonable to suppose that the surety company with its very substantial interest in having the largest amount realized, would not have kept itself informed of what was being done. Statement of the results was submitted and passed upon on behalf of the surety company, and at no time does it appear any objection was made to what was done or being done. Under all the circumstances, and apart from the strict rules for admeasuring damages as between parties dealing at arm's length, the evidence fairly warrants the conclusion that what was here done in that regard was in the surety company's interest and met with its approval. Upon the record before us, the recovery was fairly within the warranted maximum, and we perceive no error whereof the surety company is justified in complaining.

The judgment is affirmed.